**DAVID H. ANGELI**, OSB No. 020244
david@angelilaw.com
**TYLER P. FRANCIS**, OSB No. 162519
tyler@angelilaw.com
**COLIN H. HUNTER**, OSB No. 131161
colin@angelilaw.com

ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Plaintiffs Key Compounds LLC*
*and Alexander Reyter*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| KEY COMPOUNDS LLC and ALEXANDER REYTER,<br><br>        Plaintiffs,<br><br>  vs.<br><br>PHASEX CORPORATION and HANS SCHONEMANN,<br><br>        Defendants. | CASE NO. 6:20-cv-680<br><br>**COMPLAINT**<br>(Negligence, Gross Negligence, Breach of Contract)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Key Compounds LLC ("Key Compounds") and Alexander Reyter ("Reyter") (together, "Plaintiffs") bring this action against Defendants Phasex Corporation ("Phasex") and its President, Hans Schonemann ("Schonemann") (together, "Defendants").

Plaintiffs allege as follows:

## INTRODUCTION

1.      Industrial hemp production and processing is the fastest-growing portion of Oregon's agricultural sector. The Willamette Valley in particular is a leader in the production of cannabidiol, better known as CBD, one of many chemical compounds present in industrial hemp and other hemp derivatives, which are extracted from the plant, processed and refined to remove unwanted constituents such as tetrahydrocannabinol ("THC")—the psychoactive compound present in both hemp and marijuana plants—as well as waxes, fats, lipids, and chlorophyll. The final product is then packaged and sold to retail consumers in national chains such as CVS and Walgreens and used in products ranging from food and beverages to cosmetics and dog treats.

2.      In 2018, Plaintiff Key Compounds and CEO and co-Plaintiff Alexander Reyter decided to locate Key Compounds' multi-million-dollar, state-of-the-art hemp refining and processing facility in Albany, Oregon, in close proximity to the recently established Global Hemp Innovation Center at Oregon State University.

3.      With its significant capital investment, deeply talented team, proximity to innovators and a booming market, and numerous contracts with significant customers, Key Compounds was well on its way to establishing one of the largest pharmaceutical-grade hemp processing facilities in the country, creating dozens of sustainable jobs, and establishing itself as a first-mover in an extremely profitable industry by the end of 2020.

4.      Instead, as a result of Schonemann and Phasex's inexplicable decision to send Key Compounds an interstate shipment containing industrial hemp with a THC concentration well in excess of what is allowable under both Oregon and federal law, Key Compounds and Reyter became the targets of a criminal investigation, pursuant to which certain of the company's critical equipment was seized. Having lost access to and use of its critical equipment, Key Compounds was forced to vacate its premises, cease operations, lay off its employees, and

liquidate its assets, leaving the company unable to fulfill its contractual obligations to its customers. Both Key Compounds and Reyter were charged in a felony indictment, which cost hundreds of thousands of dollars to defend. As a result of this ordeal, Key Compounds was unable to fulfill its obligations to its customers, who canceled their substantial contracts, leaving the company with no source of revenue.

## THE PARTIES

5.    Plaintiff Alexander Reyter is a citizen of the State of California.

6.    Plaintiff Key Compounds LLC is an Oregon limited liability company and a citizen of the State of California.[1]

7.    Defendant Phasex Corporation is a Massachusetts corporation with its principal place of business located in North Andover, Massachusetts.

8.    Upon information and belief, Defendant Hans Schonemann is a citizen of the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the State of Oregon.

---

[1] *See* Corporate Disclosure Statement for Plaintiff Key Compounds LLC, concurrently filed.

**FACTS**

I. **Phasex agrees to process Key Compounds' industrial hemp oil and return extract to Key Compounds containing "non-detectable levels" of THC.**

11. Key Compounds employed a talented core team of scientists, engineers, and operators immersed in research and development of industrial processes. Its goal was simple: develop a scalable industrial process to take crude CBD oil (initially extracted from hemp biomass) and remove the small amount of THC naturally present in industrial hemp, ultimately producing CBD hemp oils with undetectable amounts of THC.[2]

12. Although the terms "marijuana" and "cannabis" are often used synonymously, as a matter of both Oregon and federal law cannabis is treated differently depending on whether it is "industrial hemp" (defined as cannabis with THC levels at or below 0.3 percent) or "marijuana" (defined as cannabis with THC levels above 0.3 percent).

13. Industrial hemp is no longer a controlled substance under Oregon or federal law, and is generally legal to grow, handle, buy, sell, or transport in interstate commerce.

14. Like all entities that grow, produce, or handle industrial hemp and its byproducts in Oregon, Key Compounds had a valid Industrial Hemp Handler Registration from the Oregon Department of Agriculture.

15. As Key Compounds was finalizing preparations on its own hemp processing facility, it sought to serve its customers' needs by retaining another company to refine industrial hemp extract on behalf of its customers.

16. On January 7, 2019, based on a referral from another Oregon company, Reyter reached out to Phasex and spoke with Phasex's President, Hans Schonemann, by telephone.

---

[2] Delta-9 (or "d-9") THC is the psychoactive compound present in cannabis plant material. This Complaint uses the terms "THC" and "delta-9 THC" interchangeably.

17.     Reyter explained to Schonemann that Key Compounds wanted Phasex to undertake the same type of processing that it had done for its other Oregon customer: accept a shipment of industrial hemp extract and concentrate the extract's CBD levels while removing (or "mitigating") any THC to nondetectable levels.

18.     The next day, Schonemann sent Reyter a detailed email outlining Phasex's THC mitigation process, known as "$CO_2$ purification."

19.     Schonemann explained that Phasex received crude hemp oil extract in 40-kilogram increments with CBD levels between 40% and 60% and THC levels "as high as 8%" and processed it into winterized amber oil with "non-detectable levels" of delta-9 THC. Schonemann informed Reyter that the cost for each 40 kilogram "run" was $22,500.

20.     Key Compounds and Phasex agreed to proceed, and on January 9, 2019, Reyter (on behalf of Key Compounds) signed a letter agreement that Phasex prepared and proposed, which outlined the scope of work and pricing for Phasex's $CO_2$ purification process. This agreement (and the emails it explicitly incorporated by reference) again confirmed that Phasex would ship "winterized, Amber oil" with "non-detectable levels of d-9 THC" to Key Compounds in Oregon.

21.     Also on January 9, 2019, Key Compounds shipped a 40-kilogram batch of industrial hemp oil to Phasex for processing. That same day, Key Compounds also transferred a down payment of $9,000 to Phasex via ACH.

## II.     The Phasex $CO_2$ Purification Process

22.     The Phasex $CO_2$ purification process utilizes supercritical fluid chromatography with liquid carbon dioxide as a mobile phase passing through a stationary column filled with a solid adsorbent material.

23.    Schonemann and Phasex represented to Reyter and Key Compounds that the Phasex process would effectively mitigate THC from industrial hemp oil containing THC levels "as high as 8%" and reduce it to nondetectable levels.

24.    When carried out correctly, this process entails introducing a 40-kilogram run of input oil onto a stationary column and pumping liquid carbon dioxide at particular pressures and temperatures through the column. As the industrial hemp oil travels down the stationary phase, the various components in the oil (THC, CBD, waxes, pesticides, etc.) travel through the column at different rates. CBD travels quickly, whereas THC and the other cannabinoids travel more slowly. As a result, the CBD exits the column before the THC.

25.    Phasex would then collect so-called "fractions" of material from the column at discrete points in time during the run, timed to take advantage of the varying rates that CBD and THC travel through the column. The first such fraction (known as Fraction 1, or "F1") contains waxes and other material that is not of commercial value and is thus typically discarded. Additional fractions (labeled "F2," "F3," and so on) are then collected at determined intervals.

26.    In early 2019, Phasex was unable to perform "inline analysis" to determine the THC content of industrial hemp oil in real time as it was processed. Accordingly, the timing of when Phasex collected the various fractions and the length of time it allowed the process to run was of critical importance.

27.    As of January 2019, Schonemann personally directed Phasex employees with respect to how long to run this $CO_2$ purification process.

28.    If done correctly, the fractions collected by Phasex from its process would be "clean" or free of THC. If, however, the process were allowed to run for too long, the THC in the

input oil would begin exiting the machine in a more concentrated form with an even higher percentage of THC than was originally present.

29.    After a typical "run" of input oil was complete and the various fractions collected, Phasex had the opportunity to then test the THC and CBD concentrations of each fraction to ensure that only "compliant" extract (i.e., oil with non-detectable levels of THC) was shipped back to the customer.

30.    If testing revealed that any fractions contained impermissibly high concentrations of THC, these should either have been destroyed or kept in house for so-called "re-work" to be added to the next batch of industrial hemp oil sent by the same customer.

III.    **Defendants allow the remediation process to run for too long, fail to test the fractions, and ship industrial hemp oil with impermissibly high levels of THC to Plaintiffs in Oregon.**

31.    Phasex processed Key Compounds' industrial hemp oil and (after the F1 "waste fraction" was discarded) produced seven output fractions labeled as "F2," "F3," "F4," "F5," "F6," "F7," and "F8." These labels corresponded to the order in which they were collected from Phasex's processing equipment.

32.    Consistent with his typical practice, Schonemann personally directed his employees with respect to how long to run Key Compounds' hemp oil through the Phasex $CO_2$ purification process based on Schonemann's own estimation for how long the process should run.

33.    Schonemann allowed this process to run for too long. As a result, while fractions F2 through F7 contained permissible levels of THC (i.e., less than 0.3%), the final fraction collected (F8) contained THC levels measuring between 2.5% and 5%—or more than five to fifteen times the level that can be legally shipped across state lines under applicable state and federal law.

34.     While fractions F2 through F7 each consisted of an amber-colored, waxy

substance, fraction F8 looked noticeably different to the naked eye. Fraction F8 was darker in

color, more liquid in consistency, and had a significantly stronger odor than the other fractions.

35.     Although Phasex did not test the THC levels of the Key Compounds hemp oil in

real time while it was being processed, it did conduct its own in-house testing of fractions F2

through F8 after these fractions were collected.

36.     Phasex's own testing revealed that fraction F8 contained THC levels well in

excess of 0.3%.

37.     Despite having the test results for fraction F8 in their possession, Schonemann

and Phasex failed to review this information prior to shipping F8 to Key Compounds.

38.     On January 17, 2019, Defendants sent all seven fractions—including fraction

F8—via overnight UPS to Albany, Oregon in packages addressed to Reyter and Key

Compounds.

**IV.     Phasex's packages are seized by law enforcement in Oregon, exposing Plaintiffs to criminal liability for "importing marijuana items."**

39.     On January 18, 2019, the packages sent to Plaintiffs by Defendants arrived at a

UPS center in Albany, Oregon and were immediately seized by local law enforcement due to the

packages' odor and the authorities' belief that they contained "marijuana."

40.     Plaintiffs repeatedly demanded the return of the seized packages by assuring the

authorities that they had contracted with Phasex to receive industrial hemp oil with

"nondetectable levels of THC."

41.     Had Defendants done what they had promised and shipped only industrial hemp

oil with "nondetectable levels of THC," the authorities would have been forced to return Key

Compounds' industrial hemp oil and close its investigation once later testing revealed that these

fractions contained permissible levels of THC—there would have been no probable cause or other basis upon which to continue the investigation.

42.    Fraction F8, however, did not contain anything *close* to permissible levels of THC.

43.    When the police discovered the level of THC present in fraction F8, Reyter and another employee of Key Compounds were arrested and Plaintiffs were indicted in Linn County, Oregon for knowingly importing industrial hemp oil with THC levels above 0.3%—a Class C felony punishable by up to five years in prison, fines up to $125,000, and forfeiture of assets— based on their receipt of fraction F8 from Phasex.

44.    Armed with "evidence" (a test confirming THC levels exceeding 0.3%) that Plaintiffs were "illegally importing" cannabis with impermissibly high levels of THC, Oregon authorities obtained a search warrant for Key Compounds' facility and, on March 15, 2019, raided the premises with twelve heavily armed officers (including one K-9 unit) from four law enforcement agencies. Authorities seized key equipment from Key Compounds and physically detained its employees.

45.    Felony charges against Reyter and Key Compounds followed quickly thereafter, predictably accompanied by widespread press coverage. Faced with the public embarrassment and humiliation of being labeled "felons," having lost access to and use of the critical equipment necessary to sustain operations at all, let alone fulfill its obligations to its customers, and confronted with the looming expense of defending against felony charges, Key Compounds lost the use of its Albany, Oregon facility and was forced to shut its doors and watch as customer after customer canceled their contracts with the company.

46.     Plaintiffs incurred hundreds of thousands of dollars in legal fees and costs to defend themselves against the criminal charges, and although these charges were resolved in December 2019, the damage had already been done. Key Compounds' substantial customer base had moved on to new processors, and its revenue dropped to zero.

47.     By the time law enforcement eventually returned Key Compounds' hemp oil a year after its initial seizure, its value had declined precipitously from over $250,000 to less than $35,000.

48.     Key Compounds and Mr. Reyter suffered substantial damage to their reputations as a result of the widespread negative press coverage.

## FIRST CLAIM FOR RELIEF – Negligence
### (All Plaintiffs against all Defendants)

49.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

50.     Defendants knew or should have known that their conduct created a significant risk that Phasex would ship industrial hemp oil with THC levels above 0.3% across state lines to unsuspecting customers such as Plaintiffs, subjecting those customers to unwarranted criminal investigation, prosecution, asset forfeiture, legal fees, reputational harm, loss of goodwill, and/or loss of business.

51.     Despite the clear and foreseeable risks of harm, Defendants unreasonably:

    a.     subjected Plaintiffs to harm for alleged noncompliance with the legal requirements of shipping cannabis products across state lines;

    b.     failed to design and implement a system allowing for real-time, "inline analysis" of the THC content of fractions produced by the $CO_2$ purification process;

    c.      permitted the run of Key Compounds' industrial hemp oil through the $CO_2$ purification process for too long, resulting in the creation of fraction F8, which had THC levels far in excess of 0.3%;

    d.      failed to review the results of in-house testing that revealed the high THC levels in fraction F8;

    e.      failed to visually inspect the output fractions F2 through F8, which would have revealed that F8 was darker in color, more liquid in consistency, and had a significantly stronger odor than the other fractions;

    f.      failed to realize the significance of F8's different appearance and odor or conduct further inquiry or testing which would have revealed its high THC content; and

    g.      sent fraction F8 across state lines to Plaintiffs in Oregon.

52.    By sending fraction F8 to Plaintiffs in Oregon, Defendants improperly caused Plaintiffs to become the subjects of a criminal investigation, subjecting Plaintiffs to search, seizure, detention, arrest, criminal prosecution, disparagement of goods and services, harm to reputation, and invasion of privacy.

53.    As a result of Defendants' conduct, Plaintiffs suffered the following damages:

    a.      Losses associated with the loss of use of inventory, equipment, and by extension the Albany, Oregon facility, together with the disparagement and complete destruction of Key Compounds' business in an amount to be proven at trial but totaling at least $11 million;

    b.      Legal expenses in excess of $340,000 incurred by Plaintiffs defending themselves against criminal prosecution;

    c.    Reputational harm suffered by Reyter as a result of his detention, arrest prosecution, and being cast in a false light in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF – Gross Negligence
### (All Plaintiffs against all Defendants)

54.    Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

55.    Defendants held Phasex out as a sophisticated company with experience processing cannabis extract, including the removal of THC, and knew or should have known of the legal requirements for shipping such materials across state lines.

56.    In particular, Defendants knew or should have known that state and federal law prohibited the interstate shipment of cannabis products with THC levels in excess of 0.3%.

57.    Plaintiffs knew or should have known that a flawed process for extracting THC from hemp oil and shipping non-compliant material across state lines to unsuspecting customers such as Plaintiffs would likely subject those customers to unwarranted criminal investigation, detention, arrest, prosecution, asset forfeiture, legal fees, reputational harm, invasion of privacy, product disparagement, loss of goodwill, and/or loss of business.

58.    Plaintiffs displayed reckless indifference to this risk by:

    a.    failing to design and implement a system allowing for real-time, "inline analysis" of the THC content of fractions produced by the $CO_2$ purification process;

    b.    utilizing a system of THC remediation that relied on nothing more than Schonemann's "estimation" of how long to run the $CO_2$ purification process;

c.      failing to develop or implement a system or procedure for visual
inspection of output fractions prior to shipment;

d.      failing to develop or implement a system or procedure for THC testing of
output fractions prior to shipment;

e.      failing to develop or implement a system or procedure for reviewing the
results of any THC testing of output fractions prior to shipment; and

f.      failing to develop or implement any other systems or procedures that
would have prevented Phasex or its employees from subjecting
unsuspecting customers to criminal prosecution.

59.     As a result of Defendants' gross negligence, Defendants sent fraction F8 across
state lines to Plaintiffs in Oregon, recklessly placing Plaintiffs under suspicion for violating
Oregon and federal law prohibiting the importation of "marijuana items."

60.     By sending fraction F8 to Plaintiffs in Oregon, Defendants improperly caused
Plaintiffs to become the subjects of a criminal investigation, subjecting Plaintiffs to search,
seizure, detention, arrest, prosecution, legal fees, reputational harm, invasion of privacy, product
disparagement, loss of goodwill, and/or loss of business.

61.     Defendants' actions demonstrated a reckless and outrageous indifference to a
highly unreasonable risk of harm and a conscious indifference to the health, safety and welfare of
others.

62.     As a result of Defendants' conduct, Plaintiffs suffered harms as detailed in
Paragraph 53, and incorporated herein by reference.

### THIRD CLAIM FOR RELIEF – Breach of Contract
### (Plaintiff Key Compounds against Defendant Phasex)

63.     Key Compounds repeats and incorporates by reference, as if fully set forth herein, the allegations in all preceding paragraphs

64.     Key Compounds and Phasex entered into a binding and valid agreement whereby Phasex promised to process one, 40 kilogram batch of crude hemp oil through its $CO_2$ purification process and deliver oil that had "non-detectable levels" of delta-9 THC to Key Compounds in Oregon.

65.     This agreement was supported by valid consideration, consisting of a down payment of $9,000 and a promise by Key Compounds to pay an additional $13,500 upon return shipment of the processed hemp oil.

66.     Phasex breached this agreement by delivering hemp oil to Key Compounds in Oregon that contained THC levels that were not only "detectable," but far in excess of 0.3%.

67.     Phasex's breach was the result of its gross negligence as described in paragraphs 54 through 61 and incorporated here by reference,

68.      As a result, Key Compounds suffered consequential damages, as follows:

      a.     Losses associated with the loss of use of inventory, equipment, and by extension the Albany, Oregon facility, together with the disparagement and complete destruction of Key Compounds' business in an amount to be proven at trial but totaling at least $11 million;

      b.     Legal expenses in excess of $340,000 incurred by Key Compounds successfully defending itself and its officers from criminal prosecution.

69.     The consequential damages suffered by Key Compounds were foreseeable by Phasex, which knew or should have known that its breach of contract created a significant risk

that Key Compounds and its representatives would be subjected to unwarranted criminal

investigation, prosecution, asset forfeiture, legal fees, reputational harm, invasion of privacy,

product disparagement, loss of goodwill, and/or the collapse of the business.

**PRAYER**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      An award of compensatory damages in an amount to be proven at trial;

2.      An award of punitive damages;

3.      Pre- and post-judgment interest as allowed by law; and

4.      Such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.


DATED this 24th day of April 2020

Respectfully submitted,

/s Tyler P. Francis
**ANGELI LAW GROUP LLC**
DAVID H. ANGELI, OSB No. 020244
TYLER P. FRANCIS, OSB No. 162519
COLIN H. HUNTER, OSB No. 131161

*Attorneys for Plaintiffs Key Compounds LLC and
Alexander Reyter*