THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


KEY COMPOUNDS LLC;                                    Civ. No. 6:20-cv-00680-AA
ALEXANDER REYTER,

                        Plaintiffs,                  **OPINION & ORDER**

            v.

PHASEX CORPORATION;
HANS SCHONEMANN,

                        Defendants.
_____

AIKEN, District Judge.

This case comes before the Court on a Motion to Dismiss filed by Defendants

Phasex Corporation and Hans Schonemann.  ECF No. 24.  The Court concludes that

this motion is suitable for resolution without oral argument.  For the reasons set forth

below, the Motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

To survive a motion to dismiss under the federal pleading standards, the

complaint must include a short and plain statement of the claim and "contain

sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged.  The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court is not required to accept legal conclusions, unsupported by alleged facts, as true. *Id.*

## INCOROPORATION BY REFERENCE

Generally, a court may not consider material beyond the complaint when resolving a Rule 12(b)(6) motion.  Fed. R. Civ. P. 12(d).  However, a court may consider materials beyond the pleadings without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment under two exceptions: judicial notice and incorporation by reference.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Incorporation by reference is a "judicially-created doctrine that treats certain documents as though they were part of the complaint itself." *Khoja*, 899 F.3d at 1002. This doctrine is designed to prevent plaintiffs from selectively referencing portions of documents that support their claims, while omitting portions of those documents that weaken "or doom" their claims.  *Id.*  The Ninth Circuit has extended this doctrine to consider evidence on which the complaint "necessarily relies" if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  Courts must use caution when drawing inferences from documents incorporated by reference on a motion to dismiss.  *Khoja*, 899 F.3d at 1003.

A court may take judicial notice of a fact that is not subject to reasonable dispute because it is "generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Courts may take judicial notice of "undisputed matters of public record, including documents on file in federal or state courts." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

In this case, Defendants request that the Court consider the contract between the parties, Def. Mot. Ex. 1, and the judgment in an Oregon state court criminal case against Plaintiffs, Case No. 19CR14624, Def. Mot. Ex. 2, in resolving the present motion. Plaintiffs do not oppose consideration of the contract and, upon review of the pleadings, the Court concludes that the document is appropriate for consideration under the doctrine of incorporation by reference.

Plaintiffs do not explicitly oppose the Court's consideration of the criminal judgment, but dispute what inferences may be drawn from it, if any. The criminal judgment is an undisputed matter of public record on file in the Linn County Circuit Court and the Court concludes that it is a proper subject for judicial notice.

## BACKGROUND

Plaintiff Key Compounds LLC is an Oregon limited liability company. Compl. ¶ 6. ECF No. 1. Plaintiff Alexander Reyter is a resident of California and is the CEO of Key Compounds LLC. *Id.* at ¶¶ 2, 5.

Defendant Phasex Corporation is a Massachusetts corporation with its principal place of business in Massachusetts. Compl. ¶ 7. Defendant Hans Schonemann is a resident of Massachusetts and is the President of Phasex Corporation. *Id.* at ¶¶ 8, 16.

In 2018, Plaintiffs established a hemp refining and processing facility in Albany, Oregon to take advantage of a growing market for cannabidiol ("CBD"). Compl. ¶¶ 1-2. CBD is a chemical compound found in cannabis products, including hemp. *Id.* at ¶¶ 1, 12. To extract CBD, hemp is processed and refined to remove unwanted waxes, fats, lipids, and chlorophyll, as well as the psychoactive component tetrahydrocannabinol ("THC"). *Id.* at ¶ 1.

As relevant to the present case, cannabis is classified as either "industrial hemp" or "marijuana" depending on its THC content. Compl. ¶ 12. Industrial hemp is cannabis with THC levels at or below 0.3%, while cannabis with THC levels over 0.3% is considered marijuana. *Id.* Marijuana is a controlled substance, although its possession and use have been legalized in some states. "Industrial hemp is no longer a controlled substance under Oregon or federal law, and is generally legal to grow, handle, buy, sell, or transport in interstate commerce." *Id.* at ¶ 13.

Key Compounds planned to "develop a scalable industrial process to take crude CBD oil (initially extracted from hemp biomass) and remove the small amount of THC naturally present in industrial hemp, ultimately producing CBD hemp oils with undetectable amounts of THC." Compl. ¶ 11. Key Compounds' hemp processing facility in Albany was unfinished in late 2018 and so it sought out another company

to refine industrial hemp extract to fill customer orders while Key Compounds worked to complete its own facility.  *Id.* at ¶ 15.

On January 7, 2019, Reyter contacted Phasex based on a referral from another Oregon company.  Compl. ¶ 16.  Reyter spoke with Schonemann by telephone and explained that he wanted Phasex to "accept a shipment of industrial hemp extract and concentrate the extract's CBD levels while removing (or 'mitigating') any THC to nondetectable levels."  *Id.* at ¶ 17.  Schonemann provided details of Phasex's proprietary THC mitigation process, known as "$CO_2$ purification."  *Id.* at ¶ 18.

On January 9, 2019, Key Compounds and Phasex entered into an agreement under which Phasex agreed that it would process a 40-kilogram batch of crude oil through the $CO_2$ purification process in exchange for a payment of $22,500.  Def. Mot. Ex. 1, at 1.  Key Compounds would pay $9,000 as a down payment with the balance to be paid after shipment of the refined oil.  *Id.*  The agreement included an explanatory section, describing the $CO_2$ purification process:

> I want to explain a bit about the THC mitigation process—we call is [sic] CO2 purification.
>
> Typically we receive a crude extract (normally the black/amber thick oil) with specification of the order of:
>
> > -40% to 60% CBD levels
> > -1% to as high as 8% THC levels
>
> Our CO2 purification process can provide the following product from this type of input:
>
> > -Winterized, Amber oil
> > -CBD levels >80%
> > -Non-detectable levels of d-9 THC
> > -Yield of input CBD in non-detectable fractions about 80% to 85%

Def. Mot. Ex. 1, at 1.

The agreement also contained terms concerning Phasex's performance of the THC mitigation process, which is referred to as a "study,":

> We will devote our best efforts to carrying out the work on this study. The results obtained, our recommendations, and written material will be our best judgment based upon the information available to us. In any event, our liability shall not be greater than the amount paid to us for the services rendered.

> This letter shall constitute the agreement between us, and any change must be confirmed in writing; our agreement will be interpreted according to the laws of the Commonwealth of Massachusetts, unless an existing agreement indicates otherwise.

Def. Mot. Ex. 1, at 2.

On January 9, 2019, Key Compounds shipped a 40-kilogram batch of industrial hemp oil to Phasex for processing and transferred the $9,000 down payment called for under the agreement to Phasex. Compl. ¶ 21.

During the $CO_2$ purification process, Phasex collects "fractions" of the material being processed at determined intervals so that the fractions are "clean" or free of THC. Compl. ¶¶ 24-28. Timing was critical in the process because Phasex was unable to determine THC levels while the process was underway and, if the process was allowed to run for too long, the input oil would begin exiting the machine with a higher concentration of THC than was originally present. *Id.* at ¶¶ 26, 28. After a typical "run" of input oil was complete and the fractions were collected, Phasex had the opportunity to test the THC and CBD concentrations of each fraction to ensure that only oil with non-detectable levels of THC was shipped back to its customers.

Compl. ¶ 29.  In January 2019, Schonemann personally directed Phasex employees on how long to run the $CO_2$ purification process.  *Id.* at ¶ 27.

Phasex processed the Key Compounds hemp oil shipment and the process yielded seven fractions labeled F2, F3, F4, F5, F6, F7, and F8.  Compl. ¶ 31.[1]  The process was carried out under Schonemann's personal direction "based on Schonemann's own estimation for how long the process should run."  *Id.* at ¶ 32.  Unfortunately, Schonemann allowed the process to run for too long and the final fraction, F8, contained THC levels measuring between 2.5% and 5%.  *Id.* at ¶ 33.  The THC concentration of F8 exceeded the threshold for what could lawfully be shipped across state lines under applicable state and federal law.  *Id.*  F8 was also visually distinct from F2 through F7 and had a significantly stronger odor.  *Id.* at ¶ 34.

Phasex tested the fractions after the process was complete and the testing revealed that F8 contained THC levels greater than 0.3%.  Compl. ¶¶ 35-36.  Schonemann and Phasex did not review the test results before shipping all seven fractions via overnight carrier to Albany, Oregon in packages addressed to Plaintiffs on January 17, 2019.  *Id.* at ¶¶ 37-38.

On January 18, 2019, the packages arrived in Albany and were immediately seized by police on suspicion that they contained marijuana.  Compl. ¶ 39.  Plaintiffs represented to the authorities that they had contracted with Phasex to receive oil with non-detectable levels of TCH.  *Id.* at ¶ 40.

---

[1] Fraction F1 was made up of "waste" material and discarded.  Compl. ¶¶ 25, 31.

Police testing revealed the elevated THC levels in F8 and Reyter was arrested on suspicion of importing marijuana. Compl. ¶ 43. Police also obtained a search warrant for Key Compounds' facility in Albany. *Id.* at ¶ 44. The search was carried out on March 15, 2019 and police seized Key Compounds' hemp refining equipment and detained its employees. *Id.*

The seizure of its equipment left Key Compounds unable to meet its obligations to its customers or carry on its operations. Compl. ¶ 45. Key Compounds lost all revenue and was eventually forced to close its doors. *Id.* at ¶¶ 45-46.

Plaintiffs were indicted in Linn County Circuit Court for unlawfully importing or exporting a marijuana item, a Class C felony, based on their receipt of F8 from Phasex. Compl. ¶ 43; Def. Mot. Ex. 2., at 1-2. Plaintiffs' indictment was widely covered in the media, with consequent damage to their reputations. Compl. ¶¶ 45, 48. Plaintiffs incurred hundreds of thousands of dollars in legal fees and costs in defending themselves against the criminal charges. *Id.* at ¶ 46.

On December 6, 2019, Reyter pleaded "no contest" to a charge of Unlawful Export of a Marijuana Item on or about January 10, 2019 in violation of ORS 475B.227(4)(a), a Class A misdemeanor. Def. Mot. Ex. 2, at 1. Reyter was obliged to be finger-printed and pay a $100 fine. *Id.* at 1-2. All charges against Key Compounds were dismissed with prejudice. *Id.* at 1. Plaintiffs forfeited "[a]ny evidence that is 0.3% TCH or above as well as the HPLC Machine seized by the arresting police agency" and agreed not to sue Linn County or local law enforcement. *Id.* at 1-2. The

rest of Plaintiffs' hemp oil was returned by police, but in the year since its seizure the value of the oil had dropped from over $250,000 to less than $35,000. Compl. ¶ 47.

## DISCUSSION

Plaintiffs bring claims for (1) negligence, (2) gross negligence, and (3) breach of contract.[2] Defendants move to dismiss all claims, arguing that the contract between Key Compounds and Phasex is void for illegality on public policy grounds and that Plaintiffs' claims are otherwise defective.

## I.    Choice of Law

The agreement between Key Compounds and Phasex provides that it will be interpreted according to the laws of Massachusetts, Def. Mot. Ex. 1, at 2, and so the Court must first address the choice-of-law issue.

"When sitting in diversity, [federal courts] apply the choice-of-law rules of the forum state." *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012). Under Oregon law, "the contractual rights and duties of the parties are governed by the law or laws the parties have chosen," and the "choice of law may extend to the entire contract or to part of a contract." ORS 15.350(1). "The choice of law must be express or clearly demonstrated from the terms of the contract," and "[i]n a standard-form contract drafted primarily by only one of the parties, any choice of law must be express and conspicuous." ORS 15.350(2).

---

[2] The claim for breach of contract is between Key Compounds and Phasex, without Reyter or Schonemann. Compl. ¶¶63-69.

However, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision," and "are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992).

In this case, neither party appears to dispute the effectiveness of the contract's choice-of-law provision and the Court finds no reason bar the application of the provision. Accordingly, the Court will assess Plaintiffs' contract claim according to the law of Massachusetts. As for Plaintiff's negligence and gross negligence claims, the parties agree that Oregon law applies.

## II.   Illegal Contract

Defendants contend that the contract between Key Compounds and Phasex is void on public policy grounds as an illegal contract and that, as a consequence, Plaintiffs cannot maintain their claims for negligence or breach of contract.

"As a general rule, one who has participated in a violation of the law will not be allowed to assert in court any right based upon or directly connected with the illegal transaction." *Yankee Microwave, Inc. v. Petricca Commc'n Sys., Inc.*, 53 Mass App. Ct. 497, 509 (2002).

> When deciding whether a violation of statute or a regulation renders a contract void as against public policy, we generally consider such factors as what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were the characteristics which gave the plaintiff's act its value to the defendant the same as those which made it a violation of law); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff; how gross or undeserved the defendant's windfall.

*Seggese v. Kelley*, 445 Mass. 434, 440 (2005) (internal quotation marks and citations omitted, alterations normalized).

"The courts will not reward illegal performance that 'permeates the parties' transaction,' even where the contract itself does not call for illegal performance." *Yankee Microwave*, 53 Mass. App. Ct. at 509 (quoting *Tocci v. Lembo*, 325 Mass. 707, 710 (1950)). However, when the illegal part of performance was "merely an incidental part of the contract," courts will not permit the opposing party to benefit from a windfall by denying relief. *Reynolds Aluminum Bldg. Prods. Co. v. Leonard*, 395 Mass. 255, 259 (1985). Massachusetts courts "warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found," and courts "do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law." *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 175 (1997) (internal quotation marks and citations omitted).

In this case, some clarification is required before proceeding to the substance Defendants' argument. First, Defendants contend the contract called for Plaintiffs to ship oil to Phasex containing between 1% and 8% THC, which exceeds the THC concentration that can lawfully be shipped across state lines. Def. Mot. 10-11. This is not what the plain terms of the contract require. Rather, the contract says that Phasex "typically" receives a shipment containing that level of THC and that it can refine such an oil until it contains non-detectable levels of THC. Def. Mot. Ex. 1, at 1. The passage in the agreement is a statement of Phasex's technical ability, rather

a contract term to be performed.  The contract does not suppose, let alone require, that Plaintiffs will ship oil containing illegal concentrations of THC.  In their Complaint, Plaintiffs have alleged that they shipped "industrial hemp oil," to Defendants, which they define as containing 0.3% or less THC.[3]  Compl. ¶¶ 12, 21. The Court therefore concludes that, whatever transpired in the course of the parties' actual dealings, the contract itself does not require either party to do anything illegal.

Defendants also contend that Reyter's no contest plea to the misdemeanor charge of exporting marijuana in sending the crude oil to Defendants for processing will serve to establish illegality in the performance of the contract.  A plea of no contest or *nolo contendere* "is, first and foremost, not an admission of factual guilt," but "merely allows the defendant so pleading to waive a trial and to authorize the court to treat him as if he were guilty."  *United States v. Nguyen*, 465 F.3d 1128, 1130-31 (9th Cir. 2006) (citing *North Carolina v. Alford*, 400 U.S. 25, 36 (1970)).  In Massachusetts, courts have held

> We do not doubt that a sentence imposed after a plea of nolo contendere amounts to a conviction in the case in which the plea is entered.  But we are of opinion that a record showing a conviction on such a plea is not admissible in another proceeding to show that the defendant was guilty. A plea of nolo contendere is not an express confession of guilt, as is a plea of guilty, but is merely an implied confession.

---

[3] Defendants aver that they can prove the oil Plaintiffs shipped to Phasex contained more than 0.3% THC.  Such representations are beyond the scope of what may be properly considered in a Rule 12(b)(6) motion and so the Court confines itself to the allegations of the Complaint and the judicially noticed material.  Defendants also contend that nothing in their $CO_2$ purification process will add THC to a substance being refined.  While that representation is likely true, it is also beside the point because Plaintiffs do not allege that Defendants added THC to the oil.  Rather, Plaintiffs allege that Defendants' errors in performing the $CO_2$ purification process resulted in an illegal concentration of THC in F8 after detectable levels of THC were eliminated from the other fractions.

*White v. Creamer*, 175 Mass. 567, 568 (1900).[4]

Federal courts are in accord: "A conviction resulting from a *nolo contendere* plea under these circumstances is not by itself sufficient evidence to prove a defendant committed the underlying crime." *Nguyen*, 465 F.3d at 1131 (citing *Olsen v. Correiro*, 189 F.3d 52, 60 (1st Cir. 1999)).

Consistent with these precedents, the Court declines to accept that Reyter's plea of no contest to the marijuana export charge is sufficient to establish his guilt in a subsequent civil action, particularly at the pleading stage. As noted, Plaintiffs have alleged that they legally shipped industrial hemp (*i.e.*, containing 0.3% or less THC) to Phasex for processing.

Furthermore, even if the Court were to accept that Reyter was factually guilty of sending crude oil containing more than 0.3% THC, that fact would not suffice to render the contract unenforceable. The purpose of the contract was to remove all detectable traces of THC from the crude oil and concentrate the CBD in the refined oil. That service was the "value" Plaintiffs sought from Defendants in exchange for their money. If Reyter sent crude oil containing more than the lawful amount of THC, such misconduct would have been merely incidental to the agreement between the parties because the intended result would have been to receive refined oil free of detectable THC. Any illegal act by Reyter does not "permeate" the agreement and

---

[4] The Oregon Supreme Court has similar held that a plea of *nolo contendere* "is not an admission of guilt, and neither the plea nor the conviction based upon its admission is admissible in evidence in a later action to prove conviction of a crime." *In re Corcoran*, 215 Or. 660, 662 (1959). "The only advantage in a plea of *nolo contendere* gained by the defendant is that it gives him the advantage of not being estopped to deny his guilt in civil action based upon the same facts." *Id.* (internal quotation marks and citation omitted).

allowing Defendants to evade liability on that basis would amount to nothing more than an impermissible windfall.

The Court therefore concludes that the contract between Key Compounds and Phasex is not void and Plaintiffs are not barred from recovering under the contract.[5]

## III.    Negligence and Gross Negligence

In addition to their claim for breach of contract, Plaintiffs bring claims for negligence and gross negligence.  As previously noted, these claims are to be considered under Oregon law.  In Oregon, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987).  A claim for negligence can be "legally cognizable even when there is a contractual relationship between the parties." *Abraham v. T. Henry Constr., Inc.*, 350 Or. 29, 37 (2011).  "Because tort liability is imposed by common law negligence principles, that responsibility exists unless altered or eliminated by a contract or some other source of law." *Id.* at 36-37.

Defendants contend that Plaintiffs cannot recover on their tort claims because they allege purely economic harms.  Defendants also contend that Plaintiffs' negligence claims fail because there is no source of tort duty outside of the contract between Key Compounds and Phasex.

---

[5] Defendants also argue that the contract being void for illegality will bar tort recovery, but this argument likewise fails because the contract is not void.

### A. Economic Loss Doctrine

Under Oregon common law, the economic loss rule generally bars recovery for purely economic losses under a claim of negligence, unless there is a special relationship between the parties. *Harris v. Suniga*, 344 Or. 301, 305 (2008). "[A] negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise care to prevent foreseeable harm." *Onita Pac. Corp. v. Trs. of Bronson*, 315 Or. 149, 159 (1992).

The Oregon Supreme Court has defined economic loss as "financial losses such as indebtedness incurred and return of monies paid, *as distinguished from damages to injury to person or property*." *Harris* 344 Or. at 310 (internal quotation marks and citation omitted, emphasis in original); *see also Hale v. Groce*, 304 Or. 281, 284 (1987) ("[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property."). Oregon courts have defined "economic losses" to include "financial losses to intangibles, such as lost profits, lost insurance proceeds, attorney's fees, and failed loan transactions." *Benson Tower Condo. Owner's Ass'n v. Victaulic Co.*, No. 3:13-cv-01010-SI, 2014 WL 5285475, at *3 (D. Or. Oct. 15, 2014) (internal quotation marks and citation omitted).

In this case, Plaintiffs do not allege the existence of any special relationship with Defendants. Plaintiffs' negligence claims allege that they suffered the following damages:

> a. Losses associated with the loss of use of inventory, equipment, and by extension the Albany, Oregon facility, together with the

> disparagement and complete destruction of Key Compounds'
> business in an amount to be proven at trial but totaling at least
> $11 million;
>
> b.  Legal expenses in excess of $340,000 incurred by Plaintiffs
> defending themselves against criminal prosecution;
>
> c.  Reputational harm suffered by Reyter as a result of his detention,
> arrest, prosecution, and being cast in a false light in an amount
> to be proven at trial

Compl. ¶¶ 53, 62.

Harm to Reyter's reputation, disparagement of Key Compounds, lost profits, and attorney fees all fall within the definition of "purely economic losses." *Benson Tower*, 2014 WL 5285475, at *3; *see also Portland Trailer & Equip., Inc. v. A-1 Freeman Moving & Storage, Inc.*, 166 Or. App. 651, 655 (2000) ("[A]ttorney fees incurred as a result of defendants' conduct" is a form of economic loss); *Wenzel v. Klamath Cnty. Fire Dist. No. 1*, Case No. 1:15-cv-1371-CL, 2017 WL 8948595, at *14 (D. Or. Aug. 29, 2017) ("Any harm to Plaintiff's reputation is distinguishable from injury to his person for purposes of the economic loss rule, as reputational harm would result in financial losses such as indebtedness incurred and return of monies paid." (internal quotation marks and citation omitted)).  The economic loss doctrine also applies to claims for negligence when "a plaintiff seeks damages for future impairment of an ongoing business or enterprise," and "'[w]hether the claim is characterized as one for economic loss, interference with economic expectancy, or prospective economic advantage, recovery is normally denied.'" *Wells Fargo v. U.S. Bank*, Civil No. 06-1515-ST, 2007 WL 270430, at *2-3 (D. Or. Jan. 25, 2007) (quoting *Ore-Ida Foods, Inc. v. Indian Head Cattle Co.*, 290 Or. 909, 916 (1981)).  Because

these harms are all purely economic, as distinct from a readily ascertainable or quantifiable injury to person or property, Plaintiffs cannot recover for them in the absence of a special relationship and no such relationship is alleged in the present case. The Court therefore grants Defendants' motion and dismisses Plaintiffs' claims for negligence and gross negligence to the extent that they seek to recover for lost profits, damage to reputation, attorney fees, or the eventual collapse of Key Compounds as a viable business.

There is, however, one type of harm alleged by Plaintiffs that goes beyond the purely economic—the seizure and sequestration of Key Compounds' equipment from its Albany facility. In *Lamka v. Keybank*, 250 Or. App. 486, (2012) *abrogated on other grounds by Alfieri v. Solomon*, 358 Or. 383 (2015), the Oregon Court of Appeals considered a case in which the plaintiff purchased a boat from a dealership and financed that purchase with a loan from a bank. *Id.* at 488. Shortly afterward, the dealership sold the same boat to a third party and the third party financed his purchase of the boat with a loan from the same bank that had extended a loan to the plaintiff. *Id.* at 488-89. The plaintiff brought a negligence claim against the bank, alleging that "as a result of the sale and financing of the boat and tailer to [the third party], plaintiff lost the use and enjoyment of his boat for two years; furthermore he alleged that the boat, when returned, was less valuable as a result of someone else's use." *Id.* at 494. The circuit court dismissed the plaintiff's negligence claim under the economic loss doctrine, but the Court of Appeals reversed, holding that the

plaintiff's allegations "describe an injury beyond purely economic loss." *Id.* (internal quotation marks omitted).

In this case, Plaintiffs allege that they were deprived of the use of their equipment and property for over a year as a result of Defendants' negligence and that, when their property was returned, it had substantially diminished in value. The Court concludes that, consistent with *Lamka*, this allegation goes beyond purely economic harm and describes a harm to property. Whether this claim will be borne out by discovery and proven to the trier of fact remains to be seen. However, the Court declines to dismiss Plaintiffs' claims for negligence and gross negligence to the extent that they seek to recover for the temporary deprivation of Plaintiffs' property.

### B. Tort Duty Outside of the Contract

Defendants contend that when, as here, the relationship between the parties is defined by contract, the contract alone cannot create a tort duty to support a claim for negligence.

The Oregon Supreme Court "has long recognized that tort and contract remedies may coexist." *Abraham*, 350 Or. at 38. In 1992, the Oregon Supreme Court summarized the choice between contract and tort remedies thus:

> When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the

> breach of contract was negligent, intentional, or otherwise.  In some
> situations, a party may be able to rely on either a contract theory or a
> tort theory or both.

*Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 106 (1992).

In 2011, the Oregon Supreme Court clarified its earlier ruling in *Georgetown*,
explaining that "common law negligence principles apply—notwithstanding a
contractual relationship—as long as the property damage for which the plaintiff
seeks recovery was a reasonably foreseeable result of the defendant's conduct."
*Abraham*, 350 Or. at 40.  "Thus, a negligence claim for personal injury or property
damage that would exist in the absence of a contract will continue to exist *unless* the
parties define their respective obligations and remedies in the contract to limit or
foreclose such a claim."  *Id.* (emphasis in origina).

Not every breach of contract can be brought as a tort claim, however.  The
Oregon Supreme Court clarified the distinction with a helpful hypothetical example
concerning a contract between a homeowner and a contractor for the installation of
copper pipes in a house.  *Abraham*, 350 Or. at 40-42.  In the hypothetical example,
the contractor installed PVC pipes, rather than the copper pipes specified by the
contract.  *Id.* at 41.  If the failure to install copper pipes caused a reduction in the
value of the house, the plaintiff would be able to bring a claim for breach of contract
because the claim is "based *solely* on a breach of a provision in the contract."  *Id.*
(internal quotation marks and citation omitted, emphasis in original).  "On the other
hand, if the contractor installed the PVC pipe in a defective manner and those pipes
therefore leaked, causing property damage to the house, the homeowner would have

claims in both contract and tort," because "the obligation to install copper instead of PVC pipe is purely contractual," but the manner of installing the pipe "implicates both contract and tort because of the foreseeable risk of property damage that can result from improperly installed pipes." *Id.*

In this case, Plaintiffs allege a breach of contract, in that Defendants did not refine the oil to remove detectable THC. To borrow the hypothetical example from *Abraham*, this failure would be analogous to the installation of PVC pipes in place of copper. It arises purely under the contract and would not be actionable at tort. However, Plaintiffs *also* allege that Defendants' negligence in shipping THC-rich oil foreseeably led to the seizure and sequestration of Plaintiff's property. That second allegation is analogous to the leaking pipes from the *Abraham* illustration and would be actionable under a theory of tort. Accordingly, the Court concludes that Plaintiffs' negligence claims are not barred by the contractual relationship between the parties.

## IV.    Contractual Limitations on Damages

Finally, Defendants argue that the contract's limitations on damages will serve to restrict Plaintiffs' ability to recover under either their claim for breach of contract or their claim for negligence. The contract in this case provides that "[i]n any event, our liability shall not be greater than the amount paid to us for the services rendered." Def. Mot. Ex. 1, at 2. The only money paid to Phasex was the $9,000 down payment. Compl. ¶ 21.

As previously discussed, the terms of the contract must be interpreted according to the law of Massachusetts. Under Massachusetts law, a party may

contract to limit its liability for consequential damages as a result of a breach of the contract. *Arthur D. Little. Int'l, Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1201-02 (D. Mass. 1996). In addition, a party "may, by agreement, allocate risk and exempt itself from liability that it might subsequently incur as a result of its own negligence," or the negligence of its agents or employees acting on its behalf. *Sharon v. City of Newton*, 437 Mass. 99, 105 (2002).[6] Massachusetts courts have endorsed such limitations, noting that "the consensual allocation of risk is not contrary to public policy" and "[l]imiting damages to a refund of the purchase price . . . where the two parties are sophisticated business entities, and where consequential damages in the event of a problem could be extensive" is a "reasonable business practice." *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 373-74 (1990) (internal quotation marks and citation omitted). In sum, "Massachusetts law favors the enforcement of releases." *Sharon*, 437 Mass. at 105. However, the language of such disclaimers must be "clear and unambiguous." *Burten v. Milton Bradley Co.*, 763 F.2d 461, 465 (1st Cir. 1985).

The contract term limiting Phasex's liability in this case is clear and unambiguous. Given that both parties to the contract were sophisticated business entities and engaged in an arms-length negotiation, the Court concludes that the term "in any event," is broad enough to encompass both damages for breach of contract and for ordinary negligence. *See, e.g., Rohnstein Corp. v. KPMG, LLC*, No.

---

[6] Under Massachusetts law, parties may not contract against liability for harm caused by gross negligence. *Zavras v. Cape Rovers Motorcycle Club*, 44 Mass. App. Ct. 17, 18-19 (1997). Accordingly, Defendants only move to apply the contract limitation to Plaintiffs claims for breach of contract and ordinary negligence. Def. Mot. 24.

04-3517, 2007 WL 4416840, at *1-2 (Sup. Ct. of Mass., Suffolk Cnty. Dec. 10, 2007) (holding that a contract term providing the defendant's "maximum liability to Client arising for any reason relating to services rendered under this engagement shall be limited to the fees paid for those services," was facially "clear and unequivocal."). The limitations clause of the contract is therefore enforceable.

Plaintiffs also claim that the contract term limiting liability cannot apply to Schonemann himself because the contract was between Key Compounds and Phasex and does not contain any express terms extending that limitation to the employees and agents of Phasex. By the same token, Plaintiffs contend that the limitation on liability cannot apply to the claims brought by Reyter, who is not personally a party to the contract. In *Rohnstein*, the Massachusetts court rejected a similar argument by a plaintiff seeking to avoid the enforcement of a liability clause:

> His argument is thus an effort to use his relationship to the corporation, and its contracts with KPMG, as both a sword and a shield, aligning himself with the corporation to obtain the benefits of the contracts, but separating himself from it to avoid the damage limitation provision of the contracts. He is not entitled to do so. If he has any cause of action at all, it is subject to the terms of the contract, including the limitation of liability clauses.

*Rohnstein*, 2007 WL 4416840 at *3 (internal citations omitted).

Although the Court has concluded that Plaintiffs have stated a claim for negligence, as discussed in the preceding section, the claim is still rooted in the contract, which established the relationship between the parties, and Massachusetts law clearly permits parties to limit their liability for ordinary negligence in such

circumstances.[7]  The Court concludes, therefore, that Plaintiffs' claims for breach of contract and ordinary negligence are subject to the clause limiting Defendants' liability to the amount paid under the contract.

## CONCLUSION

Defendants' Motion to Dismiss, ECF No. 24, is GRANTED in part and DENIED in part, as set forth above.

It is so ORDERED and DATED this _____31st_____ day of August 2021.


 /s/Ann Aiken
ANN AIKEN
United States District Judge

---

[7] Oregon law is in accord, in that parties may, by contract, "limit tort remedies in such a way that the common law standard of care has been supplanted, or, in some circumstances, by contractually limiting or specifying available remedies."  *Abraham v. T. Henry Const., Inc.*, 350 Or. 29, 40 (2011).